**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION ASHLAND DOCKET**

Eastern District of Kentucky
**F I L E D**

NOV 0 9 2018

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES ex rel**                          :
                                                   :
**[Filed Under Seal]**                             :
                                                   :       **CIVIL ACTION NO.**
**v.**                                             :       0:18-CV-109-HRW-EBA
                                                   :
                                                   :
*Relators-Plaintiffs*,                             :
                                                   :       **FILED UNDER SEAL**
**[Filed Under Seal]**                             :
                                                   :
                                                   :
*Defendants*                                       :
                                                   :       **DO NOT PLACE IN PRESS BOX**
                                                   :       **DO NOT ENTER ON PACER**
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :
                                                   :

**<u>FALSE CLAIMS ACT COMPLAINT</u>**

COMES NOW Relators Tawnya Clark and Michele Hunter, on behalf of themselves and the United States of America and allege as follows:

1.      Relators bring this action on behalf of themselves and the United States of America to recover statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33.

2.      These claims are based upon Defendants' submission of false and fraudulent patient claims for payment to the United States, and its fiscal intermediaries, in order to obtain millions of dollars in payments from Medicare, Medicaid and Tricare from 2014 to the present. Defendants' false and fraudulent claims to the United States took various forms including Defendants' submission of false claims to the United States for urine drug testing tainted by kickbacks paid to or from the Defendants to physicians that violated the Anti-Kickback and Stark Laws. These kickbacks included: the provision of free laboratory supplies; payment for collectors who performed other services for client practice groups, loans to practice groups; provision of free software and hardware to perform neuropsych testing for which practice groups could bill; provision of free wi-fi service; and provision of free printers as improper inducements for referrals.

3.      Defendants U.S. Medical Laboratory, LLC and Blue Water Toxicology, LLC submitted and caused the submission of facially false claims for tests conducted at an uncredentialed laboratory with NPI and CLIA numbers from other entities placed on the claim forms submitted to the United States.

4.      As more specifically alleged below, Defendants engaged in false and fraudulent behavior in connection with their laboratory services. Defendants have submitted or caused to be submitted false claims to Medicare, Medicaid, Tricare and other federal payors for services that were unlawfully referred to Defendants in violation of the Anti-Kickback Statute, and the False Claims Act.

2

5.     Relators have complied with the requirement of the False Claims Act to provide their material evidence to the United States prior to filing suit.

6.     Relators are serving the U.S. Attorney for the Eastern District of Kentucky and the United States Attorney General with a copy of this Complaint filed under seal.

## JURISDICTION AND VENUE

7.     This action arises under the False Claims Act, as amended, 31 U.S.C. §§3729-33 to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and/or claims made and caused to be made by Defendants and/or their agents and employees in violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

8.     This Court has jurisdiction over this action under 31 U.S.C. §3730 and 28 U.S.C. §§ 1345 and 1367 (a). Jurisdiction and venue are appropriate in Kentucky because, among other reasons, some of the Defendants can be found, maintain offices, transact business, and reside in Kentucky and in the Eastern District of Kentucky. Furthermore, one or more defendants transact business in the Ashland Division of the Eastern District of Kentucky with clients that have physical locations in the Ashland Division. Thus, Defendants committed acts within this district and division that violated 31 U.S.C. §3729 et seq. and jurisdiction and venue are proper in this district and division.

9.     The following physician practices are clients of Defendants U.S. Medical Scientific, LLC; U.S. Medical Scientific Indiana, LLC; U.S. Medical Laboratory, LLC; Bluewater Toxicology, LLC; and Bobby Sturgeon within the Ashland Division of the Eastern District of Kentucky: Ashland Integrative Medicine in Ashland, Kentucky; Addiction Recovery Care, LLC in Louisa, Kentucky; Bellefonte Medical Center in Greenup, Kentucky; Hart Family Care in Ashland, Kentucky; Supportive Medicine in Ashland, Kentucky; and The Infinity Center in Ashland, Kentucky. Further, Defendant Bobby Sturgeon resides in the Eastern District of Kentucky.

3

## PARTIES

10.     Co- Relator Tawnya Clark is a citizen of Kentucky and the United States of America. Along with her Co-Relator, Mrs. Clark brings this civil action for violations of 31 U.S.C. § 3729 *et seq.* for herself and for the United States Government under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).

11.     Mrs. Clark has worked in the medical and laboratory business since 2013. She began working with U.S. Medical Scientific, LLC as the Ambulatory Services Director in August 2016. Tawnya Clark is still employed with the reorganized company U.S. Medical Laboratory, LLC and has been brought into the transition team with management.

12.     Co-Relator Clark has direct and independent knowledge of the kickbacks and other fraudulent schemes described herein as well as the false claims submitted, and caused to be submitted, by Defendants to the Federal government. She is an original source of the information contained in these allegations as that term is defined in the False Claims Act.

13.     Co-Relator Clark's direct and independent knowledge was obtained inside U.S. Medical Scientific Indiana, LLC; U.S. Medical Scientific, LLC; and U.S. Medical Laboratory, LLC where she performed many job functions that directly relate to the conduct alleged here.

14.     Tawnya Clark oversaw daily operations of the ambulatory services team—including phlebotomists, collectors, client services team, corporate training team, and logistics for remote reports. She works with leaders to reach organizational goals and assists leadership with client retention. She also had authorized access to claims data and requisitions. She is also been made part of the transition team to U.S. Medical Laboratory, LLC.

15.     In April 2018, Tawnya Clark reported the fraudulent activity she was witnessing to former owner (and named Defendant) of U.S. Medical Scientific, LLC, Michael Shaffer. Mr. Shaffer

4

created an e-mail folder for Mrs. Clark to send evidence and information regarding her concerns. Mrs. Clark did provide information to Michael Shaffer via email. Mrs. Clark also exchanged email and had conversations with the CEO about her concerns. As of October 24, Mrs. Clark has been pulled up in to a leadership role by Defendant Tyler Burke.

16.     In her new role in the inner circle transition team of the newly-reorganized company, Co-Relator Clark works closely with Defendants Bobby Sturgeon, Tyler Burke, and Jennifer Bolus.

17.     Co-Relator Michele Hunter is a citizen of Alabama and the United States of America. Along with her Co-Relator, Mrs. Hunter brings this civil action for violations of 31 U.S.C. § 3729 *et seq.* for herself and for the United States Government under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).

18.     Mrs. Hunter has worked in the medical and laboratory business since 2007. Until October 25, 2018, Mrs. Hunter worked at U.S. Medical Scientific, LLC for the past four of years.

19.     Co-Relator Hunter has direct and independent knowledge of the fraudulent schemes, kickbacks and false claims submitted and caused to be submitted by Defendants to the Federal government and is an original source of the information contained in these allegations as that term is defined in the False Claims Act.

20.     Co-Relator Hunter's direct and independent knowledge was obtained inside U.S. Medical Scientific Indiana; U.S. Medical Scientific, LLC; and U.S. Medical Laboratory, LLC where she performed many job functions that directly relate to the conduct alleged here.

21.     Mrs. Hunter held multiple roles at U.S. Medical Scientific, LLC, from September 2014 through November 2015, she worked in business development; from November 2015 through April 2017, she worked as a client retention manager.

5

22.    Michele Hunter assisted and coordinated new account implementations and worked directly with the sales team. She provided guidance for client concerns and was a liaison for the sales team and the main laboratory staff. Mrs. Hunter trained phlebotomists and collectors in off-site facilities and was the main contact for those employees. She also tracked billing issues and reported weekly and monthly specimen statistics to the executive team. She was involved in invoicing clients for supplies and services and had knowledge of whether those invoices were paid and collected upon.

23.    Since April 2017, Mrs. Hunter had been working as a corporate trainer and project manager. She developed project plans and oversaw training and development seminars and new employee training. She worked as a super-user liaison for the laboratory staff and IT company.

24.    In April 2018, Mrs. Hunter reported the fraudulent activity she was witnessing to former owner (and named Defendant) of U.S. Medical Scientific, LLC, Michael Shaffer. Mr. Shaffer had Mrs. Hunter inform another former owner, Bryan Mack, of the fraudulent activity she was witnessing. After she made the reports of fraudulent activity, Michele Hunter felt a shift in treatment toward her.

25.    Michele reported her concerns to Katie Miller, the compliance officer (who is a biology major with no legal training), on a conference call. Michele reported that she had screenshots of the evidence. At the end of the call, CEO Branka Matevich told Michele not to put any information in email format.

26.    Michele was terminated from U.S. Med Lab on October 24, 2018.

27.    Because of her experience with toxicology labs, Michele Hunter is familiar with appropriate lab behavior and the rules and regulations in this industry. Her time at U.S. Medical

6

Scientific, LLC; U.S. Medical Scientific Indiana, LLC; and U.S. Medical Laboratory, LLC has allowed first-hand exposure to the fraudulent activity by Defendants.

28.     Defendant U.S. Medical Scientific, LLC Corporation ("U.S. Med Sci") is a Delaware LLC with a principal office location and record address listed as 815 Brickwood Lane, Milton, GA, 30004.

29.     Defendant U.S. Med Sci was owned by several individuals, including Defendants Michael and Annette Schafer, Jeff Lacy, and Bryan Mack. U.S. Medical Scientific, LLC at some point was split into U.S. Medical Scientific, LLC and Defendant U.S. Medical Scientific Indiana, LLC. The former being the IT side that developed and sold integrated patient management software and the latter being the toxicology laboratory.

30.     U.S. Med Sci has referring clinic clients all over the states, many of whom are located in the Eastern District of Kentucky. The physical lab is located at 3684 Highway 150, Floyds Knobs, Indiana 47119.

31.     U.S. Med Sci never had a provider number for the company.  Rather, it used Defendant Physicians' Medical Center, LLC's provider number and Physicians' Medical Center, LLC submitted U.S. Med Sci's billing to the Government for payment through a third party billing company Zawana.

32.     Defendant U.S. Medical Scientific Indiana, LLC ("U.S. Med Sci Indiana") is a Delaware LLC and was owned by Michael Shaffer, Bryan Mack, Annette Shaffer, and Jeff Lacy. Their principal office is registered as 1249 Bassnett Drive, Milton, Georgia 30004. Defendant Physicians Medical Center is believed to have had a 22% ownership interest in the U.S. Med Sci Indiana Lab until October of 2018.  Financial spreadsheets confirm this ownership interest and the NPI number of the lab was registered to PMC.  The physical lab is located at 3684 Highway 150, Floyds Knobs,

7

Indiana 47119. U.S. Med Sci was sold to new owners on October 1, 2018. The new owners are named Defendants Bobby Sturgeon, Tyler Burke, Jennifer Bolus, and a few silent investors from the Las Vegas, Nevada area. The name has been changed to U.S. Medical Laboratory, LLC.

33. Physicians Medical Center, LLC ("PMC") is a physician owned hospital in Indiana that referred patients to U.S. Med Sci for testing. Their principal office and physical location is 4023 Reas Lane, New Albany, Indiana 47150. PMC performed billing for Defendant U.S. Med Sci and PMC had a twenty-two percent ownership interest in U.S. Medical Scientific, Indiana until the buyout in 2018

34. Because, until October of 2018, PMC did the billing for U.S. Medical Scientific, Indiana, PMC is the entity that actually submitted false claims to the Government. The PMC contact for billing was Gayle Lewis with Zawna. U.S. Med Sci did not have a Provider Number, they used PMC's number. Thus, PMC is the entity that submitted the false claims to the Government for payment and U.S. Med Sci caused the submission of false claims for payment

35. Defendant U.S. Medical Laboratory, LLC ("U.S. Med Lab") is a Kentucky LLC owned by the following individuals: Bobby Sturgeon, Tyler Burke, Jennifer Bolus, and a few silent investors from the Las Vegas, Nevada area. Relators believe that on October 1, 2018, U.S. Med Sci Indiana was officially sold to new owners and the name was changed to U.S. Medical Laboratory, LLC. Bobby Sturgeon and Tyler Burke were the largest sellers of U.S. Med Sci's services prior to their purchase of the company.

36. Defendant U.S. Med Lab is operating a lab in Floyds Knobs, Indiana, at the same location as U.S. Medical Scientific Indiana, LLC was located. Relators believe that U.S. Med Lab is operating under what they are calling a 90-day lab management agreement with Bluewater Toxicology, LLC.

8

37.     U.S. Medical Laboratory, LLC does not have an NPI number. U.S. Medical Laboratory,

LLC does not have a CLIA certification. U.S. Medical Laboratory, LLC is submitting claims for

payment using the Floyds Knobs address with Blue Water Toxicology, LLC's NPI number and

Physicians' Medical Center, LLC's CLIA certification number. These claims are facially false.

38.     Defendant Bluewater Toxicology, LLC ("Bluewater") is a toxicology laboratory that also

offers account management services. Bluewater is owned by Defendant Jennifer Bolus. Bluewater

is a Kentucky LLC located at 221 South Bardstown Road Mount Washington, KY 40047. Their

NPI Number is 1093140618.

39.     Bluewater is supposedly managing Defendant U.S. Med Lab through a lab management

agreement and/or lease. Bluewater took this new management/lease role without inspecting or

auditing U.S. Med Lab for compliance and regulatory issues. The Lab Management Agreement is

a 90-day agreement. Relators believe that the plan is for Bluewater and U.S. Med Lab to eventually

be one company, with the lab management agreement being a "trial-run."

40.     Defendant Bobby Sturgeon is a resident of Lexington, Kentucky. He is a new owner of

U.S. Medical Laboratory, LLC. He gained ownership on October 1, 2018. Prior to ownership in

the company, Bobby worked as a sales representative for U.S. Medical Scientific, LLC. He held

over 75% of the accounts for the company as a whole.

41.     Bobby Sturgeon also owns several companies, including U.S. Med Rev and SB Health.

Many of the sales representatives working for Bobby Sturgeon are all formally employed by

Medrev and/or SB Health – companies owned by Bobby Sturgeon. Many of the sales reps email

addresses are @medrevgroup and/or @sbhealth. The sales representatives under Sturgeon work

on commission based on the volume or value of referrals they send in to U.S. Medical Scientific,

LLC, now U.S. Med Lab  This commission includes payment on federal patient lab samples. The

9

sales representatives working under Bobby Sturgeon are employed by third party marketing companies and are paid commissions based on the value of reimbursement of toxicology samples referred from the doctors and clinics they solicit. These commissions on federal reimbursement violate the Anti-Kickback Statute and False Claims Act.

42.     Defendant Tyler Burke is a new owner of U.S. Med Lab. He took over October 1, 2018. Prior to ownership in the company, Mr. Burke worked as a sales representative for U.S. Med Sci. Tyler Burke is a resident of Louisville, Kentucky.

43.     Relators believe that Mr. Burke has some interest in BoiTE Medical and he also has an ownership several pain clinics. Those pain clinics refer to U.S. Med Sci and Mr. Burke earns commissions on those referrals. One of these clinics is Vitality Pain in Frankfort, Kentucky.

44.     Defendant Jennifer Bolus is a new owner of U.S. Medical Laboratory, LLC. She became an owner on October 1, 2018. Ms. Bolus is also the owner of Bluewater Toxicology who is allegedly managing the new U.S. Medical Laboratory, LLC under a 90-day lab management agreement and lease agreement.

45.     Defendant Michael Shaffer is a former owner of U.S. Medical Scientific, LLC and U.S. Medical Scientific Indiana, LLC. Relators Michele Hunter and Tawnya Clark both informed Michael Shaffer of their concerns of potential fraud and FCA violations in April 2018. About a month later, Tawnya Clark again voiced her concerns to Michael Shaffer in a verbal conversation. This conversation also included concerns regarding Defendant Bobby Sturgeon and his sales and kickback practices.

46.     Defendant Annette Shaffer is a former owner and Vice President of U.S. Medical Scientific, LLC and U.S. Medical Scientific Indiana, LLC. Annette Shaffer is Defendant Michael

10

Shaffer's ex-wife. Relators believe that Annette received half of Michael's ownership when they divorced.

47.     Defendant Jeff Lacy is a former owner of U.S. Med Sci Indiana. At one point in the past, Jeff Lacy tried to take over the lab but this never came to fruition.

48.     Defendant Bryan Mack is a former owner of U.S. Med Sci and U.S. Med Sci Indiana. Relators believe that Bryan is still a minority owner in the IT business. However, they are not sure what his role and in what capacity he is involved.

49.     The above-listed Defendants either bill Government-funded healthcare programs or have significant ownership and control over other Defendants who do so and are fully responsible for the conduct of these other Defendants, as well as all injuries and damages caused by them and all penalties, awards, and judgments entered against them.

50.     In addition, the above-listed Defendants either bill Government-funded healthcare programs, or have caused Government-funded healthcare programs to be billed, and have maintained possession, custody, or control of certain property or money obtained from Government-funded healthcare programs, which should have been reimbursed to those programs.

## THE LAW

### The False Claims Act

51.     During all times relevant to the facts of this case, the False Claims Act provided in pertinent part that:

> (a) any person who - - (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly

11

and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

* * * *

is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person.

* * * *

(b) . . . For purposes of this section (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . . (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

**The Stark Law**

52.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits a hospital (or other entity providing designated healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the service provider.   The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a designated healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

53.     The Stark Law establishes a clear rule that the government will not pay for designated healthcare items or services prescribed by physicians who have improper financial relationships with other providers.  42 U.S.C. § 1395nn(g)(1).  In enacting the statute, Congress found that improper financial relationships between physicians and entities to whom they refer patients can compromise the physicians' judgment as to whether an item is medically necessary, safe, effective, and of good quality.  Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities' services than similarly situated physicians who did not have such relationships.  The statute was designed specifically to reduce the loss suffered by the Medicare and other Federal Healthcare programs due to such increased questionable utilization of services.

54.     Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applies to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239 § 6204.

55.     In 1993, Congress extended the Stark Law ("Stark II") to referrals for ten additional

designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social

Security Act Amendments of 1994, P.L. 103-432, § 152.

56.     As of January 1, 1995, Stark II applied to patient referrals by physicians having a prohibited

financial relationship for the following ten additional designated health services: (1) Inpatient and

outpatient hospital services; (2) Physical therapy; (3) Occupational therapy; (4) Radiology; (5)

Radiation therapy; (6) Durable medical equipment and supplies; (7) Parenteral and enteral

nutrients, equipment and supplies; (8) Prosthetics, orthotics and prosthetic devices and supplies;

(9) Outpatient prescription drugs; and (10) Home health services. *See* 42 U.S.C. § 1395nn(h)(6).

57.     In pertinent part, the Stark Law provides:

> Prohibition of certain referrals
> In general
> Except as provided in subsection (b) of this section, if a physician (or an
> immediate family member of such physician) has a financial relationship with an
> entity specified in paragraph (2), then –
>> (A) The physician may not make the referral to the entity for the furnishing of
>> designated health services for which payment otherwise may be made
>> under this chapter, and
>> (B) The entity may not present or cause to be presented a claim under this
>> subchapter or bill to any individual, third party payor, or other entity for
>> designated health services furnished pursuant to a referral prohibited
>> under subparagraph (A).42 U.S.C. § 1395nn (emphasis added).

58.     The Stark Law broadly defines prohibited financial relationship to include any

"compensation" paid directly or indirectly to a referring physician.  Violation of the statute may

subject the physician and the billing entity to exclusion from participation in federal health care

programs and various financial penalties, including (a) civil money penalty for each service

included in a claim for which the entity knew or should have known that the payment should not

14

have been made under Section 1395nn(g)(1); and (b) an assessment of the amount claimed for a service rendered pursuant to a referral the entity knew or should have known was prohibited.

59.      In sum, the Stark Law prohibits healthcare providers from billing Medicare and other federal health care programs for certain designated services referred by physicians with whom the provider has a financial relationship not falling within the safe harbors. The statute specifically prohibits providers from billing for such services. The Stark Law was applicable to the entire time period of this complaint.

60.      Compliance with the Stark Law is material to the government's decision to pay a claim. If the Government were aware of the Stark Law violation, knowledge of the violation would have a natural tendency to influence the payment decision because claims that violate the Stark law are subject to disallowance and penalties against the provider. Further, providers are required to certify compliance with the Stark law on the CMS 1500 claim form.

61.

**The Anti-Kickback Statute**

62.      The Federal Anti-Kickback statute, contained at 42 U.S.C. §1320a-7b(b), prohibits the offer, solicitation, payment or receipt of anything of value which is intended to induce the referral of patients for items or services reimbursable in whole or in part under any federal health care program, or to induce the ordering, recommending or arranging of items or services reimbursable in whole or in part under any federal health care program. The Anti-Kickback Statute was enacted in 1972.

63.      Violators can be assessed a civil monetary penalty of up to $50,000 for each false record or statement, plus three times the amount of the claim for payment under the Federal health care program, and may be excluded from participating in Federal and/or State health care programs.

15

42 U.S.C. § 1320a-7a(a). The Anti-Kickback Statute applies to any "Federal health care program," which includes both Medicare and Medicaid. 42 U.S.C. § 1320a-7b(f)(1)-(2).

64.     In 2010, Congress amended the Anti-Kickback Statute to state that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 (PPACA), § 6402(f), 42 U.S.C. § 1320a–7b(g).

65.     Compliance with the Anti-Kickback statute is material to the government's decision to pay a claim. If the Government were aware of the kickback, knowledge of the kickback would have a natural tendency to influence the payment decision because claims that violate the AKS are statutorily ineligible for payment.

## THE MEDICARE PROGRAM

66.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of HHS administers the Medicare Program through CMS, a component of HHS.

67.     The Medicare program consists of multiple parts. Medicare Part A provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §1395c-1395i-2 (1992).

68.     Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the fee schedule amount for physician, laboratory and diagnostic services. 42 U. S.C. §§ 1395k, 13951, 1395x(s). Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers, known as fiscal intermediaries, to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395u.

16

69.     As a condition of payment, the Defendants were required to expressly or impliedly certify compliance with the Medicare laws and regulations including the Stark and Anti-Kickback laws.

70.     At all times relevant to the Complaint, Defendants were participating Medicare Part B providers.  The Defendants submitted claims to Medicare for services that were tainted and false by the nature of the prohibited financial relationship between Defendants and its physicians as described below. Defendants also submitted claims that were facially false claims for payment to Medicare and other federal payors.

71.     At all times relevant to the complaint, the Medicare program constituted a substantial source of revenue for the Defendant.

72.     Defendants also submitted false claims to State Medicaid Programs and Tricare.

## THE FRAUDULENT SCHEMES AND FALSE CLAIMS FOR PAYMENT

### *Kickbacks by Providing Free POC Test Cups*

73.     U.S. Med Sci Indiana violated the False Claims Act by providing free Point of Care ("POC") testing cups to their physician clients. While there may have been invoices in Defendants' system, there was no attempt to collect payment for the cups. In fact, much of the POC cup debt dates back to 2016. Relator Clark has direct and independent knowledge of this practice, because she maintained these records as a part of her employment with Defendant U.S. Med Sci Indiana.

74.     POC testing cups collect samples and provide screening test results right on the cup. Point-of-care urine testing cups, however, provide an additional advantage in that they contain chemically activated strips that indicate the presence of certain drugs in a patient's urine. Therefore, physicians can use point-of-care urine testing cups to perform in-office or "qualitative testing" to analyze their patient's drug use or abuse.

17

75.     While POC testing cups only provide limited information and cannot reveal the exact quantity of a drug in a patient's system or distinguish between different substances in a class of drugs. Providing certain immediate clinical information is better than no clinical information, as it allows the physician to make decisions while the patient is physically in the physician's office; thus, the provision of the POC testing cups is a benefit to the physician.

76.     To verify qualitative testing results and acquire more detailed patient information, physicians will send patients' point-of-care urine testing cups to clinical laboratories for confirmation testing. Confirmation testing is performed on the same specimen, typically by an outside laboratory equipped to conduct an analysis of the specimen. U.S. Med Sci Indiana; U.S. Med Lab; and Bluewater all have the laboratory and equipment to perform confirmation testing.

77.     One practice, Prescribe Recovery, also leased an analyzer so that they could perform further testing of the specimens on-site at their practice. Prescribe still ordered the full confirmation panel on their patients from Defendants, even in the absence of a physician on-site to make the order. The physician signatures were applied by the Practice Manager, Tara Cooper.

78.     An example of POC testing cups being provided for free is ICAN Crestview Hills/Northern Kentucky Addiction. Michele Hunter has a large number of unpaid invoices for this account.

79.     Defendants were aware that the POC testing cups and the immediate test results that it provided to the physician in-office had financial value to their physician clients—a free cup and the ability to perform in-office urine drug testing. Further, physicians could and did bill for the POC testing. This is a violation of the Anti-Kickback Statute because the purpose of providing free point-of-care urine testing cups is to induce the physician's Federal health care program referrals.

18

80.     Defendants provided these free point-of-care urine testing cups to physicians to induce them to then send the cups back to U.S. Med Sci Indiana for both full panel screening and confirmation testing. Defendants knowingly provided remuneration to physicians with free POC urine testing cups worth thousands of dollars in exchange for referrals in violation of the Anti-Kickback Statute.   Defendants provided these kickbacks to obtain referrals.

*Providing Collectors for Physician Offices*

81.     U.S. Med Sci Indiana and U.S. Med Lab also violated the AKS and False Claims Act by providing and paying for collector personnel in the physician's offices. The provision of free cups taints the confirmation testing from the onset, because the referral is based on an improper inducement. However, U.S. Med Sci, Indiana and U.S. Med Lab use an additional method of inducement for the confirmation tests: the provision of collectors who perform other duties in addition to merely collecting and processing the samples for the laboratory.

82.     Collectors worked in the physician offices to collect the urine samples. However, they were performing other duties for the physician on a daily basis. Sales representatives sold U.S. Med Sci Indiana and U.S. Med Lab's services by offering to hire individuals that were already employed with the physicians' offices. The benefit and inducement to the physician was that they would no longer have to pay the collector/employee from their payroll any longer. The collectors were employees of and paid by U.S. Med Sci Indiana and U.S. Med Lab.

83.     About eighty-five percent of the collectors hired by U.S. Med Sci Indiana were already employees of the physician or physician practice group.  U.S. Med Sci Indiana simply took that overhead expense on as a kickback to obtain the referral of testing.

84.     There are multiple examples of client physician's wives and other family members being hired on as collectors by U.S. Med Sci Indiana. There are even more examples of employees of

the physician's practice being hired as collectors when they also serve the office in another role—even executive directors of the practice have been hired as collectors.

85.     U.S. Med Sci Indiana had little to no compliance training for the collectors, no on-site visits were made, or permitted by the salse force, to check in on them, and there was not a form listing what collectors could and could not do in the office. Relators tried to conduct on-site visits for collectors in order to observe their activities, but were prohibited by the sales personnel from doing so.

86.     Tawnya Clark recently conducted the exit interview for former float collector, A.S. During this interview, A.S. told Tawnya that the collectors were going in to the patient's charts for the physician and that they were conducting the POC tests for the physician at the different locations that she visited.

87.     Employing collectors in the offices of physicians that perform non-collection duties for the physician violates the Anti-Kickback Statute and is an improper inducement to receive referrals of screening and confirmation testing for Medicare and Medicaid beneficiaries, as well as from other federal payors.

88.     Some of the physician practices and fraudulent activity surrounding collectors are as follows:

89.     **Lighthouse Recovery:** Located in Owensboro, Kentucky. Collectors at this clinic also held other roles while they were working as collectors with U.S. Med Sci Indiana For example, Collector T.B. was also listed as a Men's Supervisor. Collector D.A. was also listed as Executive Director. Hiring these two administrators as "collectors" was used to obtain the business of the

20

account. Paying the Executive Director and Men's Director in order for the recovery center to send tests to U.S. Med Sci Indiana is a blatant violation of the Anti-Kickback Statute.

90.    **Midwest Integrated Health System:** Located in Cincinnati, Ohio. The physician's wife, Jasmine Cooper, was the office manager for the clinic and was also hired as a "collector" for the clinic. Relator Michele Hunter informed this clinic that family members of the physicians could not serve as collectors. However, that did not stop the situation. This clinic sent over 1,000 samples per month. Because of the volume sent in by this clinic, compliance issues were being overlooked by U.S. Med Sci Indiana.

91.    **East Louisville Interventional Pain/Commonwealth Pain:** U.S. Med Sci Indiana had a long-standing relationship with this account. A former float collector named D.A. reported that during slow times at this account collectors would get the patient charts prepared for the physicians and welcome patients to the office and take them back to the examination room. D.A., informed William "Bill" Sartin that she was uncomfortable performing other duties at the clinic. She was sent home that day. Tawnya Clark spoke to CEO Branka Matevich about this. Tawnya was instructed not to put anything in writing/email form and not to send it to compliance. If it was sent to compliance it would have to be looked at for compliance with regulations and upper management did not want this to be on compliance radar. As a result of this report, Tawnya was ultimately reprimanded.

92.    **Premier Pain Treatment Institute:** Located in Ohio. This was one of Defendant Bobby Sturgeon's largest accounts. Collectors at this account were running the analyzers and performing the POC tests for the practice. The collector at this account, V.K., contacted Bill Sartin and asked for additional help. This account did not have urine test volume to justify another collector. When

asked why they needed help, the collector responded that they were performing other tasks besides merely collecting samples.

93.    **St. Benedict's Homeless Shelter:** The "collector" for this account, J.M., is also the Associate Director of the Shelter. This is one of Defendant Bobby Sturgeon's accounts. Bobby demanded that Jeff be hired as the collector in order to get the business.

94.    **Indiana Pain and Spine:** Phlebotomists were performing office duties and were receiving free drug screen tests. When emails were exchanged about these issues, CEO Branka Matevich specifically said not to put this in email/writing.

95.    **ICAN/Northern Kentucky Addiction:** Located in Crestview Hills, Kentucky. Collectors and Phlebotomists employed by U.S. Med. Sci Indiana are also performing tests with the analyzer for the practice.

96.    **St. John Neumann; Dr. Merced:** Located in Jackson, KY.  Dr. Merced's wife was the office manager and wanted established employees of the practice serving in the role of collectors and being paid by U.S. Med. Sci Indiana. Collectors at this location were filling out charts, bringing patients back to the room, and more.

97.    **Addiction Recovery Care, LLC:** At the request of this clinic, U.S. Med Sci Indiana was hiring past patients as collectors for the clinic. Relator Michele Hunter was having issues with these individuals and wanted to let them go. Bobby Sturgeon said that they could not be let go. Michele believes that hiring their past patients was been a condition of U.S. Med Sci Indiana obtaining the Addiction Recovery Account. After Relator Michele Hunter complained, she was removed from this account. This clinic also had an analyzer that was run by the past patient collectors.

*Kickbacks By Providing Free Software; Free Patient Electronic Medical Record Software;*

22

*and Free iPads*

98.     U.S. Med Sci Indiana and U.S. Med Lab violated AKS and the False Claims Act by providing to its referring physicians and practice groups free software and iPads to perform neuropsych screenings on patients. In addition to providing the software and iPad for the nueropsych screenings to be conducted, U.S. Med Sci Indiana and U.S. Med Lab also provided the billing codes to be used (96103, 96116, 96118, 96119, 96120).

99.     These benefits were provided to the physician practice groups when they agreed to use U.S. Med Sci Indiana's toxicology lab for confirmation testing. This arrangement violates the Anti-Kickback Statute because the purpose of providing free software and iPads to perform neuropsych screenings was is to induce physicians' Federal health care program referrals.

100.    The software provided was through U.S. Med's Sci's IT system. It is called Prescribe. Typically, the iPad and software system was provided for a flat fee of $525/month. However, the database shows that the monthly invoices were unpaid for those physician clients that sent their patient confirmation tests referrals to U.S. Med Sci Indiana's toxicology lab.

101.    Others are paying for this service, those who send in toxicology confirmation referrals are receiving this service for free and are able to bill for this service. Thus, the service has a value that some physicians are willing to pay for each month. However, the toxicology physician clients were not required to pay as long as they referred test specimens to U.S. Med. Sci, Indiana.

102.    An example of a physician practice that received the software and iPads but did not pay the invoices was The Pain Institute. Another is Midwest Integrated Health, located in Cincinnati, Ohio.  This practice also received free wi-fi from U.S. Med Sci Indiana as a kickback for their referrals.

103.    Medical Resource Center, received a free printer and printer supplies for the office as an inducement for referrals. The printer and supplies were used for the entire office and not just the lab results.

104.    U.S. Med. Sci. also violated the AKS and False Claims Act was by providing free patient electronic records software that is far more extensive than a simple requisition and results portal. The EMR System, Prescribe, is provided for free to physician clients who send U.S. Med. Sci., Indiana their toxicology referrals. This system has a patient portal that houses patient records, prescriptions, vital signs, and other tabs that allow the physician clients to manage their entire patient practice. This is a huge benefit to the physician and saves their practice a large amount of money each year. Each practice requires some sort of software system to manage their practice and, as an inducement for referrals, U.S. Med. Sci. is providing this software for free.

### *Loan Kickbacks*

105.    Jeff Lacy was U.S. Med. Sci. owner. He was also a patient of East Louisville Interventional Pain/Commonwealth Pain. Jeff's bills were written off frequently and his blood draws and testing were conducted for free. Because the clinic was in a bad financial situation, Jeff loaned the account $400,000 of his own money to Dr. Bill Haney, owner of the clinic, in order to save the clinic from bankruptcy. Jeff was an owner in U.S. Med. Sci and U.S. Med Sci, Indiana at the time of his "loan" to Dr. Haney. Because Dr. Haney was a client of U.S. Med Sci, Indiana, the loan to save the company is an inducement for Dr. Haney to send his full panel screening and confirmation tests to U.S. Med. Sci. for which U.S. Med. Sci Indiana and Jeff Lacy would obtain revenue from Medicare, Medicaid and Tricare.

Self-Referral Violations

24

106.    PMC funded the brick and mortar laboratory for U.S. Med. Sci. in Floyds Knobs, Indiana

in exchange for 22% of the revenues. Thus, PMC had a 22% ownership interest in the U.S. Med.

Sci lab (a/k/a U.S. Med. Sci Indiana).  This was calculated regularly and 22% was given to the

hospital on the total revenues.  PMC physicians owned PMC and thus owned 22% of U.S. Med

Sci Indiana.  PMC physicians also referred federal test specimens to U.S. Med Sci, Indiana.

### *Lack of Credentials*

107.    Neither U.S. Med. Sci. or U.S. Med Sci, Indiana was ever credentialed. They never had a

provider number for the location in Floyds Knobs, Indiana. Instead they used Defendant

Physicians' Medical Center, LLC's provider number and PMC submitted U.S. Med Sci Indiana's

claims to the Government for payment.

108.    On October 1, 2018, U.S. Med. Sci. was officially sold to Defendants Bobby Sturgeon and

Tyler Burke and U.S. Med Sci, Indiana was sold to new owners, Defendants Bobby Sturgeon,

Tyler Burke, Jennifer Bolus, and a few silent investors from the Las Vegas, Nevada area. The

name was changed to U.S. Med Lab and there is transition under a 90-day lab management

agreement with Bluewater. During this 90-day transition,  U.S. Medical Laboratory, LLC is going

to be leasing out its employees, reagents, and equipment to Bluewater and U.S. Med Lab will  be

using Bluewater's Medicare and Medicaid numbers. Bluewater is located in Mount Washington,

Kentucky. U.S. Medical Laboratory, LLC is located in Floyds Knobs, Indiana. The two entities

(Bluewater Toxicology, LLC and U.S. Medical Laboratory, LLC) are not even in the same state.

109.    Moreover, U.S. Med Lab is continuing to use PMC's CLIA number on their claim forms,

despite PMC being bought out as part of the deal and no longer being associated with the new

entity U.S. Medical Laboratory, LLC.

25

110.    From October 1, 2018 to the present and ongoing, each and every claim submitted for U.S. Med Lab to the Government, using Bluewater's NPI number and PMC's CLIA number, is a facially false claim.

### *Overutilization of the Full Panel Screening and Confirmation Tests*

111.    The result of all the kickbacks described herein is that Defendant U.S. Med Sci Indiana requires its clients (physicians and practice groups) to order full panel confirmation tests, and sometimes full panel screening tests, for their patients. As a result, U.S. Med Sci Indiana is able to bill federal payors for full panel tests and receive a greater reimbursement rate.

112.    While full panels are appropriate in some instances, they are unnecessary in the situations described herein through Defendants. U.S. Med Sci Indiana has made it their business model to get physicians and practice groups to order full panel confirmation testing for nearly every patient and sometimes full panel screening tests.

113.    The highest CPT Code used by U.S. Med Sci Indiana is G0483 and G0482. These two codes are for urine drug screens testing 22 drugs or more and 22 drugs or less.

114.    Defendant U.S. Med. Sci Indiana engaged in the above-described kickback behavior to improperly induce physicians and their practices to refer patients to their laboratory for confirmation testing. U.S. Med Sci Indiana submitted or caused to be submitted false or fraudulent claims to Medicare, Medicaid and Tricare for confirmation and screening testing, because these claims were tainted by the kickbacks described herein and were also medically unnecessary.

115.    Defendant U.S. Medical Scientific Indiana, LLC requires that its client physicians order full panel urine drug tests on every patient. U.S. Med Sci Indiana sales representatives did not offer any other option to clients other than the full panel testing. Even if the physician had their own

26

screening method as a part of their daily workflow, they would still receive full testing and federal payors were being billed for the full confirmation tests.

116.    U.S. Med Sci Indiana gives the illusion that their clients are able to select a custom panel; however, in reality, they check a box that automatically orders a full panel. Many clients do not have physician signed documentation indicating that the physician agreed to the full panel confirmation. The confirmation panel button is set up in the Prescribe system to automatically populate the testing on the electronic requisition to make it simple for the collectors, rather than the physician, to order.

117.    Thus, the physicians never provides an actual order to the collectors. Therefore, the majority of the physician clients do not look at individual requisitions, because the system allows the providers to go in and "sign all" with the push of a button.  There are many practice group clients of U.S. Med Sci Indiana that do not even have physicians at the practice to do the ordering, because the physician granted another person authorization to sign the orders for him or her.

118.    The Pain Institute is an example of an account where a U.S. Sci Med Indiana employee was creating panels in the physician's Prescribe requisition system. Here, the physician objected because he was not ordering full panel confirmation testing for his patients.

119.    At East Louisville Interventional Pain/Commonwealth Pain, the physician's signature was forged on requisition forms to order a custom panel confirmation. If the requisition form was actually signed by the physician, there were instances where tests were being added to the requisition after the physician signed.

120.    The following are additional examples of overutilization by U.S. Med Sci Indiana accounts.

121.    **St. Benedict's Homeless Shelter:** For the purposes of the shelter determining whether the individual is taking drugs in real-time to determine if they are eligible to stay the night, a point of

27

care test is not only sufficient but is actually necessary. By the time a confirmation test is sent off and the result is returned to the shelter, the individual may no longer even be staying there. Thus, this was a blatant waste of the government's money and clear overutilization. Not only is U.S. Med Sci Indiana and their client account falsely submitting claims for payment, they are also exploiting the homeless. This is inexcusable and goes to show that U.S. Med Sci Indiana will do anything to be able to bill and receive reimbursement from federal payors.

122.   **Comprehensive Pain Center:** Located in Mississippi. The sales representative for this account was also the director of this clinic and wife to the physician of this clinic, A.V. She is no longer a sales representative for U.S. Med Sci Indiana, but she is still the director of the clinic. This representative's salary was, in part, on how many referrals her husband sent to U.S. Med Sci Indiana.  This situation resulted in overutilization, Stark Law, AKS and FCA violations.

123.   **Lighthouse Recovery:** Located in Owensboro, Kentucky. This is another addiction recovery clinic that was ordering G0483 exclusively. Meaning they only performed and billed for full panel tests on each and every patient.

124.   **Dr. Merced (Jackson, KY 1389 KY-15 Jackson, KY 41339):** Dr. Merced was ordering full panel confirmations so often on his patients that they were overlapping in the lab. Patients of Dr. Merced were being tested for full panel confirmations multiple times a week which is much more frequent that necessary.   Sometimes the first result would not be back to Dr. Merced before he sent another test request for the same patient.

125.   **Addiction Recovery Care, LLC:** This practice was billing all full panels all the time. Addiction Recovery is a network of treatment centers that is one of U.S. Med Sci Indiana's biggest players. They bill over $1 million in full panel tests each year.

126. **The Healing Place:** Does not have physicians present at the location, only "volunteer doctors" that are not on site. U.S. Med Sci Indiana's sales representatives found a doctor to agree to provide an active NPI with a signature and the collectors paid by U.S. Med. Sci Indiana did the ordering on every patient again by selecting the button and electronically signing all the requisitions

### *Federal Claims Information*

127. The following is claims information for actual federal patient claims for U.S. Med Sci Indiana physician clients engaged in the fraudulent conduct described above. These claims originated from physician practices in the Ashland Docket of the Eastern District of Kentucky's Northern Division:

128. **Addiction Recovery Care Claims**

| | |
|---|---|
| *Patient J.A.* | Date of Service ("DOS"): 08/09/2018 |
| Claim 329846 | |
| Passport Insurance | Payer ID: 61325 |
| Member ID: 60539431 | CPT Code: G0483 ($979.98) and 80307 ($215.49) |
| Submitted: 10/01/2018 | Adjudicated: 10/24/2018 |

| | |
|---|---|
| *Patient S.S.* | DOS: 07/17/2018 |
| Claim 326232 | |
| Anthem Medicaid Kentucky | Payer ID: ZBKYM |
| Member ID: XTF718704808 | CPT Code: G0483 ($979.98) and 80307 ($215.49) |
| Submitted: 09/27/2018 | Adjudicated: 10/09/2018 |

| | |
|---|---|
| *Patient R.H.* | DOS: 07/24/2018 |
| Claim 325434 | |
| Wellcare of KY Medicaid | Payer ID: 14163 |
| Member ID: 12245789 | CPT Code: G0483 ($979.98) and 80307 ($215.49) |
| Submitted: 09/26/2018 | Adjudicated: 10/05/2018 |

| | |
|---|---|
| *Patient M.H.* | DOS: 08/02/2018 |
| Claim 325324 | |
| Wellcare of KY Medicaid | Payer ID: 14163 |
| Member ID: 15541637 | CPT Code: G0483 ($979.98) and 80307 ($215.49) |

Submitted: 09/26/2018          Adjudicated: 10/05/2018

*Patient M.M.*                 DOS: 05/24/2018
Claim 246270
Passport Insurance             Payer ID: 61325
Member ID: 60527274            CPT Code: G0483 ($979.98) and 80307 ($215.49)
Submitted:  06/01/2018         Adjudicated: 06/21/2018

129.   **Bellefonte Medical Center Claims**

*Patient S.G.*                 DOS: 04/05/2018
Claim 193164
Humana CareSource Medicaid     Payer ID: KYSC1
Member ID: 10426793100         CPT Code: 80076 ($33.69)
Submitted: 04/09/2018          Adjudicated: 04/22/2018

*Patient J.V.*                 DOS: 4/12/2018
Claim 200400
Wellcare of KY Medicaid        Payer ID: 14163
Member ID: 14465022            CPT Code: 80053 ($42.81); 82248 ($22.89);
83735 ($31.05); 86708 ($64.09); 86709 ($45.99)
Submitted: 04/16/2018          Adjudicated: 05/02/2018

*Patient C.H.*                 DOS: 04/20/2018
Claim 206866
Humana CareSource Medicaid     Payer ID: KYSC1
Member ID: 10813572000         CPT Code: 36415 ($12); 80053 ($42.81); 80061
                               ($73.49); 82248 ($22.89); 82306 ($162.44); 82607
                               (77.96); 82746 ($75.32); 83735 ($31.05); 84443
                               ($85.89); 84550 ($24.44); 85025 ($42.64)
Submitted: 04/24/2018          Adjudicated: 05/16/2018

*Patient T.R.*                 DOS: 09/04/2018
Claim 341862
Medicare                       Payer ID: 08101
Member ID: 401920757A          CPT Code: 36415 ($12); 85025 ($42.64)
Submitted: 10/14/2018          Adjudicated: 11/06/2018

130.   **Hart Family Care Claims**

*Patient R.E.*                 DOS: 09/19/2018
Claim 350600
Wellcare of KY Medicaid        Payer ID: 14163

Member ID: 17996338             CPT Code: 80053 ($42.81); 83036 ($50.88)
Submitted: 10/19/2018           Adjudicated: 10/29/2018

*Patient C.F.*                  DOS: 08/16/2018
Claim 304974
Medicare                        Payer ID: 08101
Member ID: 401429799A           CPT Code: 80053 ($42.81); 82043 (32.60);
                                83036 (50.88)
Submitted: 08/21/2018           Adjudicated: 09/13/2018

*Patient B.C.*                  DOS: 08/20/2018
Claim 305718
Medicare                        Payer ID: 08101
Member ID: 406628398A           CPT Code: 80053 ($42.81); 80061 ($73.49);
                                82306 ($162.44); 82550 ($34.35); 84443 (85.89)
Submitted: 08/22/2018           Adjudicated: 09/12/2018

*Patient L.V.*                  DOS: 08/20/2018
Claim 312494
Medicare                        Payer ID: 08101
Member ID: 405705474A           CPT Code: 80053 ($42.81); 80061 ($73.49);
                                82306 ($162.44); 82550 ($34.35); 84443 (85.89)
                                85025 ($42.64)
Submitted: 09/11/2018           Adjudicated: 10/02/2018

*Patient W.P.*                  DOS: 09/10/2018
Claim 339604
Medicare                        Payer ID: 08101
Member ID: 401547519A           CPT Code: 80053 ($42.81); 83036 (50.88)
Submitted: 10/12/2018           Adjudicated: 11/01/2018

131.   **Supportive Medicine Claims**

*Patient C.H.*                  DOS: 10/02/2018
Claim 343498
Humana CareSource Medicaid      Payer ID: KYSC1
Member ID: 10796731900          CPT Code: G0483 ($979.98)
Submitted: 10/16/2018           Adjudicated: 11/06/2018

*Patient L.S.*                  DOS: 09/20/2018
Claim 356730
Wellcare of KY Medicaid         Payer ID: 14163
Member ID: 13526227             CPT Code: G0483 ($979.98) and 80307 ($215.49)

31

Submitted: 10/22/2018          Adjudicated: 11/01/2018

**Patient K.J.**                DOS: 09/28/2018
Claim 351520
Wellcare of KY Medicaid        Payer ID: 14163
Member ID: 12625647            CPT Code: G0483 ($979.98) and 80307 ($215.49)
Submitted: 10/19/2018          Adjudicated: 10/29/2018

**Patient J.B.**                DOS: 08/31/2018
Claim 341924
Medicare                       Payer ID: 08101
Member ID: 407191837A          CPT Code: G0483 ($979.98) and 80307 ($215.49)
Submitted: 10/14/2018          Adjudicated: 11/05/2018

132.   Each of the above claims violated the FCA by falsely certifying that the claims were in

compliance with the Stark law and AKS and the claims were medically necessary.

## COUNT I
## VIOLATION OF 3729 (a)(1)(A)

133.   Relators hereby incorporate and re-allege all the preceding paragraphs as if set forth fully

herein.

134.   As a result of illegal kickbacks, Stark Law violations, overutilization and facially false

claims made by Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci; U.S.

Med Lab; PMC; and Bluewater, Defendants by and through their agents, officers, employees, and

affiliates, knowingly presented or caused to be presented false or fraudulent claims for payment or

approval in violation of 31 U.S.C. §3729(a)(1)(A).

135.   Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci; U.S. Med

Lab; PMC; and Bluewater, by and through their agents, officers, employees, and affiliates,

knowingly and/or with reckless disregard, presented or caused to be presented false or fraudulent

claims for payment or approval in violation of 31 U.S.C. §§ 3729(a)(1) and (a)(1)(A).

136.    In certifying performance, requesting payment, and retaining overpayments, Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci; U.S. Med Lab; PMC; and Bluewater, by and through their agents, officers, employees, and affiliates, violated and continue to violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly and/or with reckless disregard, presenting, or causing to be presented, a false or fraudulent claims for payment or approval.

137.    As a direct result of Defendants' false or fraudulent claims for payment and submission of false or fraudulent records material to false or fraudulent claims, the United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by Defendants for false claims submitted to the United States.

138.    The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

139.    The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

140.    Relators are entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C. §3730(d)(1).

### COUNT II
### FALSE CLAIMS ACTS VIOLATIONS 3729(a)(1)(B)

141.    Relators hereby incorporate and hereby re-allege all of the preceding paragraphs as if fully set forth herein.

142.    Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci; U.S. Med Lab; PMC; and Bluewater, by and through their agents, officers, employees, and affiliates, knowingly or in deliberate ignorance or with reckless disregard, made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729 (a)(1)(B).

143.    As a result of the schemes described in this Complaint, Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci; U.S. Med Lab; PMC; and Bluewater, by and through their agents, officers, employees, and affiliates, submitted claims for payment under Government-funded healthcare programs and, in so doing, violated, may continue to violate, and caused others to violate and continue to violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by knowingly, and/or with reckless disregard, making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim.

144.    In certifying performance, requesting payment, and retaining overpayments, Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci;  U.S. Med Lab; PMC; and Bluewater, by and through their agents, officers, employees, and affiliates, violated and continue to violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by knowingly, and/or with reckless disregard, making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim.

145.    The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.  The United States is entitled to this sum as reimbursement for monies obtained by Defendants for false claims submitted to the United States.

146.    As a direct result of Defendants' false or fraudulent claims for payment and submission of false or fraudulent records material to false or fraudulent claims, the United States is entitled to

three times the total of damages sustained as a result of the Defendants' violations of 31 U.S.C. §3729(a)(1)(B).

147.    The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

148.    Relators are entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C. §3730(d)(1).

## COUNT III
## FALSE BILLINGS INCIDENT TO ANTI-BACK/STARK ACT VIOLATIONS

149.    Relators hereby incorporate and re-allege all preceding paragraphs as if set forth fully herein.

150.    From 2014 to the present, Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci; U.S. Med Lab; PMC; and Bluewater, by and through its agents, officers, employees, and affiliates, violated the Anti-Kickback/Self-Referral Laws, 42 U.S.C. §1395nn (a)(1), (h)(6) and 42 U.S.C. §1320a-7b(b), by entering into prohibited financial relationships with physicians in order to obtain referrals of their patients.

151.    Defendants' violations of these laws rendered them statutory ineligible to receive payment for services rendered to patients referred pursuant to these prohibited relationships, under both the express terms of 42 U.S.C. §1395nn and 1320a-7b(b) and by operation of the Medicaid/Medicare laws and regulations, including 42 C.F.R. §424.5 (a).

152.    The United States conditions payment on Defendants' compliance with the Anti-Kickback/Self Referral laws, 42 U.S.C. §§1395nn (a)(1), (h)(6) and 1320a-7b (b).

153.    Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Lab; PMC; and Bluewater, by and through their agents, officers, employees, and affiliates, submitted and continue

35

to submit claims for payment rendered to Medicare, Medicaid and Tricare patients while knowingly violating the Anti-Kickback/Self Referral laws and thereby statutorily ineligible to receive payment in violation of the False Claims Act, 31 U.S.C. §3729.

154.    Defendants' actions also caused the submission of claims for payment for services rendered for Medicare, Medicaid and Tricare patients while Defendants were knowingly violating the Anti-Kickback/Self Referral laws and statutorily ineligible to receive payment violating the False Claims Act 31 U.S.C. §3729.

155.    Accordingly, Defendants, including but not limited to U.S. Med Sci Indiana; U.S. Med Sci; U.S. Med Lab; PMC; and Bluewater, by and through their agents, officers, employees, and affiliates, knowingly presented or caused to be presented false or fraudulent claims for payment or approval and knowingly made, used, caused to be made or used, false records or statements material to a false or fraudulent claim and/or knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. §3729.

156.    As a direct result of Defendants' false or fraudulent claims for payment and submission of false or fraudulent records material to false or fraudulent claims, the United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by Defendants for false claims submitted to the United States.

157.    The United States is entitled to three times the total damages sustained as a result of Defendants' violations of the 31 U.S.C. §3729.

36

158.     The United States is entitled to a civil penalty of not less than $5,500.00 and not more than

$11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C.

2461 Note; Public Law 104-410) for each of Defendants' false claims.

159.     Relators are entitled to reasonable attorney's fees and cost pursuant to 31 U.S.C.

§3730(d)(1).

## COUNT IV
## VIOLATION OF THE WHISTLEBLOWER PROTECTION PROVISIONS
## OF THE FALSE CLAIMS ACT 31 U.S.C. §3730(h)

160.     Relators hereby incorporate and re-allege all preceding paragraphs as if set forth fully

herein.

161.     In an attempt to stop Defendants from submitting false claims, in April 2018, Michele

Hunter reported the fraudulent activity she was witnessing to former owner of U.S. Medical

Scientific, LLC, Michael Shaffer. Mr. Shaffer created an e-mail folder for Mrs. Hunter to send

evidence and information regarding her concerns.

162.     Relators Hunter, at the request of Mr. Shaffer also informed another former owner, Bryan

Mack, of the fraudulent activity she witnessed.

163.     Relator Hunter also exchanged email and had conversations with the CEO about her

concerns of collectors performing other duties for clients. Michele reported her concerns to Katie

Miller, the compliance officer on a conference call. Michele reported that she had screenshots of

the evidence. At the end of the call, CEO Branka Matevich told Michele not to put any information

in email format.

164.     Relator Hunter's reporting of fraudulent activity and violations of the AKS were an

attempt to stop one or more false claims from being submitted to the United States.

165.    After these reports, the treatment of Relator Hunter by U.S. Med. Sci and U.S. Med Lab changed. She was cut off from certain clients and her duties changed and reduced. Ultimately, Michele was terminated from employment on October 24, 2018.

166.    Defendants U.S. Med Sci Indiana and U.S. Med Lab discharged and otherwise discriminated against Relator, Michele Hunter, in the terms and conditions of her employment, because of the lawful acts done by her in furtherance of her efforts to stop one or more violations of the False Claims Act.

167.    Pursuant to the False Claims Act, Relator is entitled to reinstatement with the same seniority status that she would have had but for the discrimination, two times the amount of back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment

(a)     Ordering Defendants to pay the United States Government three times its actual damages resulting from the Defendants' violations of the False Claims Act;

(b)     Ordering Defendants to pay the United States Government a civil penalty for each false claim as set forth in the False Claims Act;

(c)     Ordering Defendants U.S. Med Sci and U.S. Med Lab to pay Relator, Michele Hunter monetary damages for its violation of 31 U.S.C. §3730 (h), the Whistleblower Protection Provision of the False Claims Act;

(d)     Awarding Relators an amount the Court decides is reasonable for collecting the civil penalty and monetary damages by pursuing this matter, which award, by statute shall not be less than 15% nor more than 25% of the proceeds of this action or the settlement of any such claim, if the Government intervenes in the action and not less than 25% nor more than 30% if the Government declines to intervene in the action;

(e)     Ordering Defendants to pay Relators' attorney's fees and costs;

(f)     Granting such other relief as the Court may deem just and proper.

**RELATOR HEREBY DEMANDS TRIAL BY STRUCK JURY.**

Respectfully Submitted,

/s/ Brian M. Vines
Matthew C. Minner
Brian M. Vines
HARE, WYNN, NEWELL &
NEWTON,LLP
200 West Vine Street; Suite 700
Lexington, Kentucky 40507
Tel: (859) 550-2900
Fax: (859) 550-2902

Don McKenna
Randi McCoy
**HARE, WYNN, NEWELL &
NEWTON,LLP**
The Massey Bldg., Suite 800
2025 Third Avenue North
Birmingham, AL 35203
Tel: (205) 328-5330
Fax: (205) 324-2165

*Attorneys for Relators*

## CERTIFICATE OF SERVICE

Pursuant to the False Claims Act, which requires service of the Under Seal Complaint on

the United States Attorney and the Attorney General of the United States, Relators are making

such service *via* certified mail on the following:

Matthew G. Whitaker
Acting United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Robert M. Duncan, Jr.
United States Attorney for the
Eastern District of Kentucky
260 W. Vine Street, Suite 300
Lexington, KY 40507

Christine Corndorf
Assistant United States Attorney
Eastern District of Kentucky
260 W. Vine Street, Suite 300
Lexington, KY 40507

/s/ Brian M. Vines
*Attorney for Relators*
